UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 08-50027 |
| | ) | |
| Plaintiff, | ) | |
| | ) | REPORT AND |
| vs. | ) | RECOMMENDATION ON |
| | ) | DEFENDANTS' MOTIONS |
| JESE HERNANDEZ-MENDOZA and | ) | TO SUPPRESS |
| EDDIE MARTINEZ, | ) | [DOCKETS 31 & 33] |
| | ) | |
| Defendants. | ) | |

**INTRODUCTION**

This matter is before the court pursuant to an indictment charging

Defendants Jesse Hernandez-Mendoza and Eddie Martinez each with one

count of Conspiracy to Distribute a Controlled Substance, in violation of 21

U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A), and two counts of Possession with

Intent to Distribute a Controlled Substance, in violation of 21 U.S.C.

§§ 841(a)(1) and 841(b)(1)(A) & (B).  [Docket 14].  Both Mr. Hernandez-Mendoza

and Mr. Martinez move the court to suppress statements made to law

enforcement and evidence seized as a result of the stop and subsequent search

of their vehicle by the Wyoming and South Dakota Highway Patrols on

February 29, 2008.  [Dockets 31 & 33].  Mr. Hernandez-Mendoza's and

Mr. Martinez's motions to suppress were referred to this magistrate judge for a

report and recommendation to the district court pursuant to Chief Judge
Karen E. Schreier's standing order dated June 11, 2007, and 28 U.S.C. §
636(b)(1)(B).

## FACTS

Evidentiary hearings on Mr. Hernandez-Mendoza's and
Mr. Martinez's suppression motions were held on June 9 and 30, 2008.
Mr. Hernandez-Mendoza and Mr. Martinez were present as were their
attorneys, Assistant Federal Public Defender George Grassby and Stanton
Anker, respectively.  The United States appeared by Assistant United States
Attorney Mark Vargo.  Eight witnesses testified in person at the hearing:  South
Dakota Highway Patrol Trooper Brian Swets; Wyoming Highway Patrol Trooper
Tim Boumeister; Crook County, Wyoming, Deputy Sheriff Captain Jeffrey
Hodge; South Dakota Division of Criminal Investigation Agent Chad Evans;
South Dakota Highway Patrol Trooper Nicholas Allen; Brian Balloon, a
paralegal and private investigator with the Federal Public Defender's Office;
Lewis Dirks, an accident reconstructionist; and James Ronfeldt, also an
accident reconstructionist with the Rapid City Police Department.  From the
testimony and exhibits admitted at the hearing, the court finds the following
facts.

On February 29, 2008, Mr. Hernandez-Mendoza and Mr. Martinez were
traveling east together on Interstate 90 through Wyoming in a black MDX

sport-utility vehicle ("SUV") manufactured by Acura.  Shortly after 1:00 p.m.
they were stopped by Wyoming Highway Patrol Trooper Tim Boumeister after
Trooper Boumeister registered a speed of 80 miles per hour on the Acura in a
75 mile-per-hour speed zone.  Mr. Hernandez-Mendoza was driving the SUV,
and Mr. Martinez was riding in the front passenger seat.  In visiting with the
defendants, Trooper Boumeister became suspicious that there might be illegal
drugs in the vehicle because he observed several factors, which he termed
"criminal indicators."[1]  These factors included:  (1) the Acura was not owned by
either of its passengers; (2) the defendants were unable to give the name of the
registered owner of the Acura; (3) the defendants were traveling from
Washington state to Fairfield, Iowa, for a week-long trip but had only one small
overnight bag; (4) there was a moderate odor of an air freshener emanating
from the interior of the vehicle; and (5) in plain view on the console between the
defendants in the front seat were several cell phones.

Trooper Boumeister testified that these factors aroused his suspicions.
He testified that drug dealers often use multiple cell phones to avoid detection
and that air freshener is often used in vehicles which are transporting drugs to
cover up the odor of the drugs.  Also, the one small overnight bag seemed to be
insufficient luggage for two men for a trip of over one week's duration.

---

[1]Trooper Boumeister defined "criminal indicators" as factors independent
of the reason for the traffic stop that raise suspicions that criminal activity is
taking place.

Trooper Boumeister testified that he issued a warning citation to Mr. Hernandez-Mendoza for speeding and, at this point, the defendants were free to leave. The only statements made by the defendants up to this point in the traffic stop were answers to the questions posed by Trooper Boumeister as to their destination, their residence, and the owner of the Acura.

After issuing the warning ticket, Trooper Boumeister told Mr. Hernandez-Mendoza that he was free to leave and cautioned him to keep his speed at 75 miles per hour. Mr. Hernandez-Mendoza exited the patrol vehicle and was walking toward the driver's side door of the Acura when Trooper Boumeister called his name, approached him outside the vehicle, and asked for permission to ask a few extra questions.

Trooper Boumeister then asked Mr. Hernandez-Mendoza to clarify his relationship to Mr. Martinez, to clarify who they were going to visit in Iowa, how long they expected to stay in Iowa, whether Mr. Hernandez-Mendoza was employed (he answered he worked in construction), to clarify whether Mr. Hernandez-Mendoza had a car of his own, who owned the Acura, and whether Mr. Hernandez-Mendoza had a wife or children, and why his wife did not accompany him on this trip.

The trooper then made contact with Mr. Martinez and asked him the same questions. Mr. Martinez gave the same answers. The trooper then asked Mr. Martinez to confirm that everything in the vehicle belonged to either him or

4

Mr. Hernandez-Mendoza.  Trooper Boumeister then asked Mr. Martinez if there was anything illegal in the Acura, specifically any drugs.  Mr. Martinez answered "no."

Trooper Boumeister then asked Mr. Hernandez-Mendoza whether there was anything illegal in the vehicle, specifically any drugs.  The trooper then went on to name several specific drugs, including methamphetamine. Mr. Hernandez-Mendoza answered "no" to each, but Trooper Boumeister testified that when he asked specifically about methamphetamine, the defendant did not make eye contact and simply shook his head "no."  Trooper Boumeister then asked if Mr. Hernandez-Mendoza would consent to allowing the trooper to search the SUV.  He consented.[2]

Trooper Boumeister testified that, after finding a tube of silicone, two screwdrivers, and observing that a factory vent in the dashboard of the Acura had been replaced with an after-market vent, he called in Captain Jeffrey Hodge, a deputy sheriff with the Crook County, Wyoming, Sheriff's Office. Captain Hodge is a canine officer.  He and his dog, Brix, are certified and trained pursuant to Wyoming law.  The video recording of the stop, however, shows that Trooper Boumeister called in Captain Hodge before he began to search the defendants' vehicle.

---

[2]Neither defendant raises the issue of the voluntariness of this consent to the search of their vehicle in Wyoming.

Captain Hodge testified that when he arrived at the scene of Trooper Boumeister's stop, the doors and the tailgate of the Acura were open and there was a strong wind blowing.  Captain Hodge asked Mr. Hernandez-Mendoza for permission to allow him to let Brix enter the vehicle.  Consent was given.   Brix entered the vehicle and alerted to the presence of drugs in the area of the dashboard.

Trooper Boumeister testified that the defendants were free to leave after he had issued the warning ticket for speeding and before Brix alerted.  After Brix alerted, Trooper Boumeister testified that the defendants were no longer free to leave.  No statements were made by defendants during the search of the Acura, except to verify that an overnight bag found in the vehicle contained both of the men's clothing for the entire trip.

For approximately the next 3 hours, law enforcement searched the Acura, concentrating their efforts in the area of the dashboard.  The officers removed the defendants and their vehicle to a Wyoming Highway Patrol shop to continue the search.  During this search, Captain Hodge placed a phone call to South Dakota Highway Patrol Trooper Brian Swets, with whom he was previously acquainted.  Captain Hodge asked Trooper Swets, also a canine officer, to check a particular internet database to find out if there were any known concealment compartments or methods with regard to Acura vehicles.

6

Trooper Swets was not able to locate any information along these lines.  No contraband was found in the Acura by the Wyoming authorities.

Eventually, a Lieutenant with the Wyoming Highway Patrol reached the conclusion that the defendants' vehicle might have been used to transport drugs in the past, but that no drugs were present in the vehicle now.  Captain Hodge expressed his disagreement with the Lieutenant's conclusion, but the Lieutenant ordered that the defendants' vehicle be released.  The defendants were released shortly before 4 p.m.  The defendants took possession of their vehicle and reentered I-90, again traveling east.

Captain Hodge placed another call to Trooper Swets's cell phone.  Captain Hodge relayed the Wyoming events regarding the defendants to Trooper Swets.  Captain Hodge indicated to Trooper Swets that there were several criminal indicators that the defendants were involved in illegal activity, including the presence of a tube of silicone in the glove box, two screwdrivers, a small amount of luggage, the defendants could not give the proper name of the vehicle's owner, multiple cell phones, an odor of air freshener, a manufactured vent in the vehicle had been removed, and Captain Hodge's dog had alerted.  Captain Hodge gave Trooper Swets a description of the vehicle, told Swets that the vehicle had Washington plates, and may have also given Swets the license plate number.  He told Trooper Swets that the Wyoming authorities had

released the vehicle, it was now heading east on I-90, and that Trooper Swets
might want to look for it.[3]

Trooper Swets testified that, after receiving this phone call from Captain
Hodge, he traveled to I-90, heading west-bound in his patrol vehicle with his
drug dog, Karlo, in the back.[4]  Trooper Swets testified that he began running
radar on east-bound traffic, specifically looking for the defendants' vehicle.
Contemporaneously with this radar operation, Trooper Swets called ahead to a
trooper in Sioux Falls to alert him to the same information that Captain Hodge
had relayed to Swets.  Swets was actually on the phone with this trooper in
Sioux Falls at the moment when he observed a black SUV traveling east that
appeared to his naked eye to be going approximately 80 miles per hour in a 75-
mile-per-hour zone.  Trooper Swets testified that his estimate of the SUV's
speed was based on his 13 years of training and experience in running radar.
In addition, he noticed that the SUV appeared to be pulling away from other
east-bound vehicles, indicating that it was going faster than surrounding
traffic.

---

[3]Phone records show that Trooper Swets and Captain Hodge talked 3 or 4
times for a total of 23 minutes.  However, testimony was introduced describing
the substance of only two of these phone calls.

[4]Evidence was introduced that Trooper Swets and Karlo are both duly
trained and certified in drug detection.

Trooper Swets ended his cell phone call to the Sioux Falls trooper, turned on his radar, tracked the SUV doing between 78 and 79 miles per hour with his radar machine, then locked his radar in on the SUV, recording a speed of 78 miles per hour.  Trooper Swets noted that the vehicle had Washington state license plates.

Trooper Swets then found a safe place to turn around in the median at approximately mile post 48 and headed east, now following the defendants' vehicle.  He waited until a location on the highway where he judged it would be safe to pull the defendants over, activated his emergency lights at this point, and stopped the defendants' vehicle.[5]  The traffic stop occurred at approximately mile post 52 on I-90.  Trooper Swets was unable to say with any precision how much time had elapsed between the time he had first spotted the defendants' vehicle and the time he pulled them over.  The videotape of the traffic stop reveals that the defendants' car stopped at 4:37:57 p.m.  Testimony from Trooper Boumeister established that the distance from where the defendants were released by the Wyoming authorities to the spot where Trooper Swets stopped them would take approximately 40 to 45 minutes to traverse,

---

[5]Trooper Swets had also briefly activated his emergency lights when he drove through the median from the west-bound lanes of I-90 to the east-bound lanes.  He then turned his lights off again while he gained ground on the defendants.  Trooper Swets testified that he delayed activating his emergency lights until he was ready to stop the defendants' vehicle so that he would delay announcing his presence to the defendants and thereby lessen the chances of having to engage in a hot pursuit.

assuming a lawful speed.[6]  Trooper Swets was unable to testify with any certainty about how fast he was traveling in pursuit of the defendants' vehicle, other than to say that he was traveling well in excess of the 75-per-mile speed limit and passed several other vehicles en route to catch up with the defendants' vehicle.

Upon stopping the defendants' vehicle, Trooper Swets noted that it was an Acura MDX SUV that bore the same license plate number that Captain Hodge had previously given Trooper Swets.  Trooper Swets approached the passenger side of the vehicle and made contact with the defendants. Mr. Hernandez-Mendoza was driving and Mr. Martinez was in the front passenger seat.  Trooper Swets asked for their identification cards and the vehicle registration.  Trooper Swets also asked who the owner of the vehicle was, to which Mr. Martinez replied, "his cousin's."  While conversing with the defendants, Trooper Swets testified that he noticed an overpowering odor of air freshener coming from the vehicle.  In addition, both defendants had rolled down their respective windows.  Trooper Swets asked both defendants to roll up their windows and he further asked Mr. Hernandez-Mendoza to join Trooper Swets in his patrol vehicle.

---

[6]Wyoming and western South Dakota are both in the Mountain Time Zone.

10

Once inside the patrol vehicle, all attempts at conversation between Tropper Swets and Mr. Hernandez-Mendoza were stymied by Mr. Hernandez-Mendoza's inability to understand English.  Trooper Swets told Mr. Hernandez-Mendoza he had been stopped for speeding, but Mr. Hernandez-Mendoza's response did not indicate comprehension of this information.  Mr. Hernandez-Mendoza is heard to say at one point that his "English is no good."  Trooper Swets asked Mr. Hernandez-Mendoza repeatedly where their destination was, but Mr. Hernandez-Mendoza was not able to understand the question and did not provide a response.  Similarly, Trooper Swets could not get a response to the question as to who owned the Acura.  Finally, Trooper Swets exited the patrol vehicle, leaving Mr. Hernandez-Mendoza seated in the front passenger seat, and made contact again with Mr. Martinez.

Trooper Swets asked Mr. Martinez again whose vehicle the Acura was, to which Mr. Martinez replied again that it belonged to Mr. Hernandez-Mendoza's cousin in Mexico and that they were driving the vehicle with his permission. Trooper Swets asked how Mr. Martinez knew Mr. Hernandez-Mendoza, to which Mr. Martinez replied that Mr. Hernandez-Mendoza was his brother-in-law.  Then Trooper Swets asked where they were traveling to, and Mr. Martinez replied that they were going to Fairfield, Iowa, for a one-week trip.  In response to questions from Trooper Swets, Mr. Martinez said he was employed in construction in Los Angeles, California, and that Mr. Hernandez-Mendoza lived

in Renton, Washington.  Trooper Swets told Mr. Martinez that he had stopped their vehicle for speeding and asked Mr. Martinez if he knew they were speeding.  Mr. Martinez indicated that he did not know they were speeding.

Mr. Martinez told Trooper Swets that they were going to visit relatives in Iowa.  Trooper Swets told Mr. Martinez that he had a drug dog in his patrol vehicle and asked "if he were to run his dog around the car," whether the dog would smell the odor of any illegal drugs.  No audible response is heard on the tape.  Trooper Swets then asked Mr. Martinez if he had any marijuana?  Any cocaine?  Methamphetamine?  Any heroin?  As to all but methamphetamine, Mr. Martinez made eye contact and answered "no."  When Trooper Swets asked about methamphetamine, Mr. Martinez looked away and simply shook his head without making any audible answer.

Trooper Swets then returned to the patrol vehicle where he confirmed with Mr. Hernandez-Mendoza that Mr. Martinez was his brother-in-law.  At 4:45:20, Trooper Swets called in Mr. Hernandez-Mendoza's name, date of birth, and driver's license information to dispatch.  Before he received a response back from dispatch, Trooper Swets deployed his drug dog around the defendants' vehicle.  The dog alerted at the seam between the front and rear doors on the passenger side.  The dog also alerted at the hatchback door of the vehicle, although Trooper Swets was around the corner of the vehicle from the dog at the time of this alert and did not notice it at the time.

Based on his dog's alert, Trooper Swets approached Mr. Martinez and asked him to step outside the Acura.  He told Mr. Martinez that his dog smelled drugs in the vehicle.  He conducted a search of Mr. Martinez's person and asked him if he had any drugs or dangerous objects in the vehicle that could hurt Trooper Swets during a search.  He also asked Mr. Martinez about past criminal convictions, and Mr. Martinez indicted that he had a conviction for driving while under the influence.  Nothing was found in the search of Mr. Martinez's person.  Trooper Swets then asked Mr. Martinez to step into the ditch next to the highway while Trooper Swets searched the vehicle.

Trooper Swets began searching on the passenger's side of the vehicle, taking the key from the ignition of the vehicle.  He then moved to the rear of the vehicle, where he noticed non-factory carpet, loose trim that was also not original to the vehicle, and a storage compartment beneath the carpet that was only a couple of inches deep.

He shouted at Mr. Martinez, "Why is this all tore up?" referring to the trim on the sides that was torn off.  Mr. Martinez replied that the Wyoming Highway Patrol tore the trim off.  Trooper Swets then asked, "Why'd they pull you over?"  To which Mr. Martinez replied, "Speeding, supposedly."  Trooper Swets replied, "You guys need to slow down."

The government concedes that this exchange should be suppressed because Mr. Martinez was not free to leave, the response he gave was in

13

response to interrogation, and he had not been given <u>Miranda</u>[7] warnings at this point.

The metal cover over the storage space in the rear of the vehicle had holes in it which allowed Trooper Swets to shine his flashlight through and illuminate several food storage containers hidden beneath the metal "floor" of the compartment.  At this point Trooper Swets approached Mr. Martinez and said to him, "Hey, why don't you do me a favor, dude?  Can you turn around and face away from me?  Turn around and face away from me.  Put your hands behind your back.  Do not mess around here, okay?  You're gonna wind up gettin' hurt, 'kay?  Somebody's gonna get dog bit if you screw around, you hear me?"

Trooper Swets then handcuffed Mr. Martinez and called for back-up patrolmen to assist him.  He then told Mr. Hernandez-Mendoza, "Get out of the car, do it now."  Presumably he handcuffed Mr. Hernandez-Mendoza as clinking metal can be heard on the tape.  After numerous phone calls, Trooper Swets placed the defendants against the rear of their vehicle.  Apparently Mr. Martinez questioned Trooper Swets as to why they were handcuffed. Trooper Swets explained that he saw packages inside the vehicle, possibly illegal drugs.  He specifically told defendants, "I don't want you to talk right now. . ." but Mr. Martinez goes on to say, "they already checked the vehicle."

---

[7]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

Trooper Swets then told defendants not to converse with each other in Spanish for the trooper's safety because he wanted to know what was going on at all times.

At 5:07:40, while waiting for backup to arrive, for the first time Trooper Swets called in Mr. Martinez's name and date of birth, and the vehicle information to dispatch. Trooper Nicholas Allen arrived soon after and placed both defendants in the back of his patrol vehicle at Trooper Swets' request. Trooper Swets testified that he had no secure place to transport defendants in his vehicle as the front seat is not secure and the back seat is entirely taken up with his dog's kennel.

Subsequent search of the defendants' vehicle revealed methamphetamine and cocaine located beneath the metal storage plate in the rear of the Acura. At this point, Trooper Allen transported the defendants to the South Dakota Highway Patrol Office in Rapid City, South Dakota. Upon arrival, Trooper Allen waited with the defendants in his patrol vehicle until he received instructions to take them into the building. During the entire time the defendants were in Trooper Allen's vehicle, a period of approximately 40 minutes, Trooper Allen's video recorder was turned on. Trooper Allen testified that he turns the video recorder on every time he transports suspects as a prophylactic to record what he says and does while he has a suspect in the vehicle with him.

While waiting in the parking lot of the Highway Patrol offices, Trooper Allen got out of the vehicle at one point.  While he was outside the vehicle, the defendants had a conversation with each other in Spanish that was recorded on the car's video recorder.  No evidence was introduced as to what the substance of this conversation entailed.  Neither Trooper Allen nor anyone else advised the defendants of the fact that the video recorder was on.  No <u>Miranda</u> warnings were given to either defendant prior to this conversation taking place.

At approximately 6 p.m., Agent Chad Evans of the South Dakota Division of Criminal Investigation arrived at the Highway Patrol office to assist with the investigation of the defendants at the request of the South Dakota Highway Patrol.  Agent Evans testified that he met with Mr. Martinez in a conference room of the Highway Patrol office.  At this point, Mr. Martinez had been placed under arrest.  Agent Evans identified himself to Mr. Martinez, told him he was there to assist with the investigation, and read Mr. Martinez his <u>Miranda</u> rights from a card.  Agent Evans asked Mr. Martinez if he understood the rights that had just been read to him.  Mr. Martinez indicated that he understood his rights.  Agent Evans then asked Mr. Martinez if he wanted to waive these rights and talk to Agent Evans.  Mr. Martinez thereafter waived his rights and allowed Agent Evans to interview him.

During this interchange, Agent Evans observed no indication that Mr. Martinez was drowsy, intoxicated, lacked intelligence, or failed to

16

understand English.  The interview with Agent Evans lasted approximately one

hour and ten minutes, including the advisement of rights.  During the

interview, Mr. Martinez told Agent Evans that Mr. Hernandez-Mendoza had not

been speeding in either Wyoming or in South Dakota.  This interview was

digitally recorded by Agent Evans.

After the interview, Agent Evans transported both Mr. Martinez and

Mr. Hernandez-Mendoza to the Meade County Jail.  Agent Evans did not

attempt to interview Mr. Hernandez-Mendoza because of the apparent language

barrier.  No interrogation or conversation of any substance occurred during the

drive from the Highway Patrol office to the Meade County Jail.  Agent Evans

took no bodily fluid samples from either defendant.

Mr. Lewis Dirks and Officer James Ronfeldt, both accident

reconstructionists, testified for the defendants and the government,

respectively.  Mr. Dirks used Trooper Swets' testimony that he first observed

the Acura at a distance of approximately 1/4 mile, that the Acura was traveling

between 78 and 79 miles per hour, and that he himself was traveling between

60 and 70 miles per hour.  Utilizing this testimony, Mr. Dirks estimated that

Trooper Swets' vehicle and the defendants' vehicle would have overtaken each

other within 6 seconds.  Mr. Dirks further estimated that it would have taken

Trooper Swets approximately 6.7 to 10 seconds to have sighted the Acura,

formed an impression of its speed, and then activated his radar.

17

Mr. Dirks also testified that, if the speed of his vehicle and that of the defendants' vehicle were stated accurately by Trooper Swets, then the defendants' vehicle should have been visible when Trooper Swets' video was activated as soon as he turned his vehicle around in the median.  The fact that the Acura was not visible at this point on the video suggests, Mr. Dirks opined, that the facts were not as Trooper Swets testified to.

The court finds this latter part of Mr. Dirks' opinion to be unreliable and rejects it.  As Mr. Dirks admitted during his testimony, this does not accord any time for Trooper Swets to check the traffic around him before slowing down sufficiently to turn around in the median.  Furthermore, Trooper Swets testified that he had to wait until he approached a place in the median that was appropriate to conduct this turn.  Mr. Dirks accorded no time in his calculation during which Trooper Swets could have looked for an appropriate turn-around location in the median.

Mr. Dirks also conceded that the radar machine in Trooper Swets' vehicle would have been able to pick up and lock in the speed of the Acura at the distances discussed in Trooper Swets' testimony.  Furthermore, he conceded that the results of the radar were far more reliable than the eyeball estimate of Trooper Swets.  Finally, Mr. Dirks conceded that it would have taken less than a second for Trooper Swets to activate the remote control for the radar, which remote was already in his hand when he first spotted the Acura.  Mr. Dirks

18

conceded that his estimate for the time it would have taken Trooper Swets to observe the Acura, eyeball its speed, and activate his radar could have been a minimum of 3.5 seconds, consisting of 2.5 seconds to determine an eyeball estimate of the speed and 1 second to activate the radar.

James Ronfeldt based his opinion on the same facts as Mr. Dirks and agreed with Mr. Dirks that the two vehicles would have passed each other approximately 6 seconds after Trooper Swets first spotted the Acura.  Using the same authority as Mr. Dirks, however, Mr. Ronfeldt estimated that Trooper Swets could have spotted the Acura, made an estimate of the speed of the Acura, and activated his radar all within 2 to 3 seconds.

Mr. Hernandez-Mendoza and Mr. Martinez argue that their statements must be suppressed due to the alleged failure of law enforcement to administer Miranda warnings.  Mr. Hernandez-Mendoza and Mr. Martinez also argue that the evidence seized from their vehicle must be suppressed because the search of their vehicle violated their rights under the Fourth Amendment to the United States Constitution.

The government resists Mr. Hernandez-Mendoza's and Mr. Martinez's suppression motion, arguing that (1) the circumstances of their detention did not warrant the giving of Miranda warnings by the Wyoming and South Dakota Highway Patrol and (2) the search of their vehicle without a search warrant was

proper because law enforcement had probable cause to believe that the vehicle contained contraband or evidence of criminal history.  See Docket 47.

## DISCUSSION

**A.     The Law Concerning Miranda Warnings at a Traffic Stop**

The holding in Miranda "is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning."  United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing Miranda, 384 U.S. at 444).  Miranda warnings protect an individual's Fifth Amendment privilege against self-incrimination by "ensuring that a suspect knows that he may chose not to talk to law enforcement, to talk only with counsel present, or to discontinue talking at any time."  Colorado v. Spring, 479 U.S. 564, 574 (1987).  A Miranda warning is required prior to questioning whenever two conditions are present:  (1) the suspect is being interrogated and (2) the suspect is in custody.  Unites States v. Flores-Sandoval, 474 F.3d 1142, 1146 (8th Cir. 2007); Griffin, 922 F.2d at 1347; United States v. Carter, 884 F.2d 368, 371 (8th Cir. 1989).

Some courts have placed the burden of proving that the defendant was not in custody at the time of the interrogation on the government.  See United States v. Charbonneau, 979 F. Supp. 1177 (S.D. Ohio 1997).  Other courts have placed the initial burden on the defendant to prove that he was "in

custody," with the burden of proof shifting to the government to prove a voluntary waiver only after the defendant has sustained her initial burden.  See United States v. Moore, 104 F.3d 377, 391 (D.C. Cir. 1997).  The Eighth Circuit appears not to have addressed this issue yet, although some district courts within the circuit have.  See, e.g., United States v. Morriss, 2006 WL 3519344 (W.D. Mo. 2006) (placing initial burden on defendant and citing to extra-circuit cases for authority).  For purposes of this report and recommendation, the court has placed the burden of proving that defendants' statements were *not* the subject of custodial interrogation on the government.

A suspect is considered to be "in custody" either upon his or her formal arrest or "under any other circumstances where the suspect is deprived of his" or her "freedom of action in any significant way."  Griffin, 922 F.2d at 1347 (citing Berkemer v. McCarty, 468 U.S. 420, 429 (1984)).  Absent formal arrest, a suspect is deemed to be "in custody" where a reasonable person in the suspect's position would have believed that his freedom of action had been curtailed to a "degree associated with formal arrest."  Berkemer, 468 U.S. at 442; United States v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005); Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370.  The test is one of objective reasonableness judged from the point of view of the suspect, not from the point of view of the interrogator.  Berkemer, 468 U.S. at 442; Black Bear, 422 F.3d at 661; Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370.  In determining

21

whether a suspect reasonably believed himself or herself to be in custody, the court examines the totality of the circumstances.  Carter, 884 F.2d at 370 (citing United States v. Lanier, 838 F.2d 281, 285 (8th Cir. 1988) (*per curiam*)).

Under the totality of the circumstances test, six nonexclusive factors have emerged with some frequency:  (1) whether the suspect was informed that he was free to leave and that answering the interrogator's questions was voluntary; (2) whether the suspect possessed freedom of movement during the interrogation; (3) whether the suspect initiated contact with the interrogator or voluntarily acquiesced in the interrogation; (4) whether the interrogator employed strong-arm tactics or strategies; (5) whether the atmosphere of the interrogation was dominated by the police; and (6) whether the suspect was arrested at the close of the interrogation.  See Flores-Sandoval, 474 F.3d at 1146-1147 (citing Griffin, 922 F.2d at 1349).  Reference to these factors is helpful, but these factors are not exclusive and custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly."  Flores-Sandoval, 474 F.3d at 1147.  In addition, the place where the interrogation took place, the purpose of the interrogation, the length of the interrogation, and other factors are also to be considered.  Griffin, 922 F.2d at 1348; Carter, 884 F.2d at 370.

The Supreme Court in Berkemer addressed the issue of whether a motorist who is the subject of a traffic stop is "in custody" for purposes of

22

<u>Miranda</u>.  After the motorist is formally arrested on a traffic violation, no matter how minor, the Court held that <u>Miranda</u> warnings are required.  <u>Berkemer</u>, 468 U.S. at 434-4335.

However, during the traffic stop itself and prior to arrest, the Court held that <u>Miranda</u> did not apply.  <u>Id.</u> at 440-441.  The Court acknowledged that a traffic stop "significantly curtails the 'freedom of action' of the driver and the passengers" in the detained vehicle, noting that drivers who see a policeman's signal neither feel free to ignore that signal nor to drive away, once stopped. <u>Id.</u> at 436.  However, a traffic stop is generally devoid of those elements of coercion that prompted the announcement of the rule in <u>Miranda</u>.  <u>Id.</u> at 436-438.  For example, the detention is presumptively temporary and brief, with the driver being allowed to continue on his way after a check of his license and registration and, perhaps, the issuance of a citation.  <u>Id.</u> at 437.  Also, the interrogation takes place in public, subject to observation by pedestrians and other vehicles, thus reducing the ability of an unscrupulous policeman to "use illegitimate means to elicit self-incriminating statements and diminish[ing] the motorist's fear that, if he does not cooperate, he will be subjected to abuse."  <u>Id.</u> at 438.  Thus, the Court concluded that the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for purposes of Miranda."  <u>Id.</u> at 440.

### 1.   Statements at the Wyoming Traffic Stop

Mr. Hernandez-Mendoza and Mr. Martinez argue that any statements made to the Wyoming State Highway Patrol on February 29, 2008, must be suppressed because law enforcement did not provide <u>Miranda</u> warnings.  Both defendants contend that, from the moment that the Wyoming State Highway Patrol stopped their vehicle, they were deprived of their freedom and were "technically under arrest" and, thus, should have been advised of their <u>Miranda</u> rights.

The government argues that the Wyoming State Highway Patrol justifiably stopped the vehicle because of a traffic violation and that the initial contact between law enforcement and the defendants did not constitute a custodial environment.  The government contends that any statements made by Mr. Hernandez-Mendoza and Mr. Martinez during this initial period of contact should not be suppressed because they were not the product of custodial interrogation.  The government "recognizes that the stop in Wyoming was significantly longer than an ordinary traffic stop and that, at some point, <u>Miranda</u> warnings would have been required prior to questioning either defendant."  However, the government indicated that it has no knowledge of any statements made by the defendants beyond the initial period of the stop.

The court finds that the Trooper Boumeister of the Wyoming Highway Patrol had probable cause to conduct the traffic stop because he observed the

24

defendants speeding.  "An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation." United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007) (quoting United States v. Coney, 456 F.3d 850, 855-856 (8th Cir. 2006) (quoting United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002)).  See also United States v. Ehrmann, 421 F.3d 774, 780 (8th Cir. 2005), cert. denied, 546 U.S. 1122 (2006).  The answers provided to the Wyoming State Highway Patrol by Mr. Hernandez-Mendoza and Mr. Martinez in response to standard questions associated with traffic stops clearly did not require the advisement of Miranda rights under the rule announced in Berkemer.  Thus, the court recommends that statements made during the initial contact period should not be suppressed.

Likewise, the statements made after Trooper Boumeister issued the warning ticket and told Mr. Hernandez-Mendoza that he was free to leave should not be suppressed.  These statements were clearly of a consensual nature and, thus, the defendants were not in custody.  Whether an encounter between a citizen and law enforcement is consensual is determined by considering the totality of the circumstances and whether, given those circumstances, a reasonable person would have believed that he was not free to leave.  United States v. Jones, 269 F.3d 919, 925 (8th Cir. 2001) (citing United States v. Mendenhall, 446 U.S. 544, 554 (1980)).  Trooper Boumeister made clear that the defendants were free to leave and free not to engage in further

25

discussion with him.  They both agreed to embark on further discussion with

Trooper Boumeister.  <u>Miranda</u> warnings were not required because neither

defendant was in custody at this time.

However, as to statements made by the defendants after Brix alerted to

the presence of drugs in the Acura, these must be suppressed because, by

Trooper Boumeister's own admission, neither defendant was free to leave at

this point.  However, the only statement the court is aware of that was made

during this time period is Mr. Martinez's confirmation that the overnight bag

contained both his and Mr. Hernandez-Mendoza's clothing for the trip.  This

statement was made in response to interrogation by Trooper Boumeister,

Mr. Martinez was no longer free to leave, and thus, the statement should be

suppressed.

### 2. Statements at the South Dakota Traffic Stop

#### a. Pre-arrest Statements

Both Mr. Hernandez-Mendoza and Mr. Martinez argue that their

statements made to the South Dakota Highway Patrol prior to their formal

arrest must be suppressed because the stop in South Dakota was a

continuation of the stop in Wyoming.  Both defendants contend that they were

"technically under arrest" from the moment their vehicle was stopped in South

Dakota because the South Dakota Highway Patrol "was going to detain the

Acura," and, thus, they should have been advised of their <u>Miranda</u> rights.

26

The government argues that the initial stop of the defendants did not place them in custody for purposes of administering Miranda warnings. The government contends that the defendants "were subject to the normal constraints associated with a traffic stop." However, as noted above, the government concedes that the exchange between Trooper Swets and Mr. Martinez concerning the state of the carpet and trim in the back of the Acura should be suppressed. This is a sound concession because, once Karlo alerted to the presence of drugs in the Acura, the situation was no longer one of an ordinary traffic stop and the defendants' detention was no longer presumptively brief and temporary as envisioned by Berkemer.

The only other statement made by either of the defendants after this exchange with Trooper Swets was when Trooper Swets told the defendants not to talk and Mr. Martinez blurted out "they already searched." This comment was unsolicited by Trooper Swets and was not the product of interrogation. Accordingly, Miranda warnings were not required and the statement cannot be suppressed on the basis of the absence of these warnings.

**b. Post-Arrest Statements**

Mr. Hernandez-Mendoza and Mr. Martinez also argue that statements made to each other while in the patrol vehicle after being formally arrested but prior to receiving Miranda warnings should be suppressed. The defendants argue that Trooper Swets created a situation "that encouraged Martinez and

Mendoza to talk" by putting them together in Trooper Allen's patrol vehicle with
a recording device on without advising defendants that their conversation was
being recorded.  The defendants argue that this practice rose to the level of
custodial interrogation.

A <u>Miranda</u> warning is required prior to questioning whenever two
conditions are present: (1) the suspect is being interrogated <u>and</u> (2) the suspect
is in custody.  <u>Flores-Sandoval</u>, 474 F.3d at 1146; <u>Griffin</u>, 922 F.2d at 1347;
<u>Carter</u>, 884 F.2d at 371.  It is clear that Mr. Hernandez-Mendoza and
Mr. Martinez were in custody for purposes of <u>Miranda</u> when they were under
formal arrest.  Whether their statements should be suppressed depends on
whether their statements to each other, unknowingly recorded in the patrol
vehicle, were made as a result of police interrogation.

Interrogation includes direct questioning or any practice reasonably
likely to evoke an incriminating response from a suspect.  <u>See</u> <u>Rhode Island v.
Innis</u>, 446 U.S. 291, 301 (1980); <u>see also</u> <u>United States v. Head</u>, 407 F.3d 925,
925 (8th Cir. 2005) ("Interrogation includes not only express questioning by law
enforcement officers, but also words or actions that officers should know are
reasonably likely to elicit an incriminating response from a suspect.").  The
"words or actions" of the police must be outside the scope of words and actions
that normally accompany the arrest and taking into custody of a defendant.
<u>United States v. Wipf</u>, 397 F.3d 677, 685 (8th Cir. 2005) (citing <u>Innis</u>, 446 U.S.

28

at 301).  "A statement made by a suspect that is voluntary and not in response

to interrogation is admissible with or without the giving of Miranda warnings."

Head, 407 F.3d at 925.

It is clear that placing Mr. Hernandez-Mendoza and Mr. Martinez in the

back of the patrol vehicle is consistent with the arresting and taking into

custody of criminal defendants–that is, placing the defendants in the back of

the patrol vehicle is an action that is normally associated with the act of

arresting a defendant.  The purpose of placing Mr. Hernandez-Mendoza and

Mr. Martinez in the back of Trooper Allen' patrol vehicle was not to elicit

incriminating information but rather to secure and transport the defendants

following their arrest.  There was a legitimate reason Trooper Swets did not

transport one of the defendants–he had no secure way to do so.  There was also

a legitimate reason for Trooper Allen to have turned his video recording device

on–as a self-protection measure for any claims that might later be made about

his conduct while transporting the defendants.

"Miranda does not bar the government from introducing into evidence

spontaneous statements made during a conversation not initiated by the

officer."  United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005).  In

addition, polite conversation between the police and a defendant that is not

steered "toward potentially incriminating topics" "is not the functional

29

equivalent of interrogation." United States v. Tail, 459 F.3d 854, 858 (8th Cir. 2006); see also United States v. Fleck, 413 F.3d 883, 893 (8th Cir. 2005).

It is difficult to see how the act of placing Mr. Hernandez-Mendoza and Mr. Martinez in the back of a patrol vehicle may be construed as being reasonably likely to elicit an incriminating response from the defendants. Mr. Martinez and Mr. Hernandez-Mendoza's conversation between themselves was not prompted by any form of police interrogation but rather were voluntary statements made to each other that happened to be recorded.  There is no evidence to suggest any trickery or deceit on the part of the officers involved. In light of the fact that police were not even in the vehicle when Mr. Hernandez-Mendoza and Mr. Martinez initiated conversation with each other, the court finds that there is no basis to suppress their post-arrest, voluntary statements made in the absence of Miranda warnings.

Finally, the court addresses the statement made by Mr. Martinez to Agent Evans.  The interview between Agent Evans and Mr. Martinez took place after a full advisement of Mr. Martinez's Miranda rights and a waiver of those rights.  Mr. Martinez makes no argument that his waiver of these rights was involuntary or unknowing.  Accordingly, there is no basis argued by Mr. Martinez that would result in the suppression of this statement.

30

**B.     Legality of the Traffic Stop in South Dakota**

Defendants argue that Trooper Swets' stop of their vehicle and the resulting detention violated their rights under the Fourth Amendment.  As a result, they seek suppression of all physical evidence and statements taken as a result of that stop.

When a law enforcement officer stops a motor vehicle and questions its occupants, the stop constitutes a search and seizure under the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief."  Brendlin v. California, 551 U.S. ___, 127 S. Ct. 2400, 2406 (2007); Delaware v. Prouse, 440 U.S. 648, 653 (1979); United States v. Wheat, 278 F.3d 722, 726 (8ᵗʰ Cir. 2001).  A stop of a vehicle results in a seizure under the Fourth Amendment of all occupants of the vehicle.  Brendlin, 551 U.S. ___, 127 S. Ct. at 2406-2408.  The "Terry stop" is a variety of traffic stop that is permissible under the Fourth Amendment if it is supported by "reasonable suspicion."

In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court stated the basis of what was to become known as a "Terry stop":

> [W]here a police officer observes unusual conduct which leads him
> reasonably to conclude in light of his experience that criminal
> activity may be afoot and that the persons with whom he is dealing
> may be armed and presently dangerous, where in the course of
> investigating this behavior he identifies himself as a policeman and
> makes reasonable inquiries, and where nothing in the initial stages
> of the encounter serves to dispel his reasonable fear for his own or
> others' safety, he is entitled for the protection of himself and others

> in the area to conduct a carefully limited search of the outer
> clothing of such persons in an attempt to discover weapons which
> might be used to assault him.”

Terry, 392 U.S. at 30.  The original “Terry stop” applied to a pedestrian, but

courts have expanded the analysis in Terry to apply to vehicle stops.  See

Ornelas v. United States, 517 U.S. 690, 693 (1996); United States v. Spotts,

275 F.3d 714, 718 (8th Cir. 2002); United States v. Bell, 183 F.3d 746, 749 (8th

Cir. 1999).

An officer making a Terry stop “must be able to articulate something

more than an ‘incohate and unparticularized suspicion or “hunch.” ’ ”  United

States v. Sokolow, 490 U.S. 1, 7 (1989).  The Fourth Amendment requires

“some minimal level of objective justification” for making the stop.  INS v.

Delgado, 466 U.S. 210, 217 (1984).  The Court has held that probable cause

means “ ‘a fair probability that contraband or evidence of a crime will be found,’

and the level of suspicion required for a Terry stop is obviously less demanding

than for probable cause.”  Sokolow, 490 U.S. at 7 (citing Illinois v. Gates, 462

U.S. 213, 238 (1983)).  “Police must have a ‘particularized and objective basis’

for suspecting criminal activity at the time the stop is made.”  Spotts, 275 F.3d

at 718.

“An officer has probable cause to conduct a traffic stop when he observes

even a minor traffic violation.  ‘This is true even if a valid traffic stop is a

pretext for other investigation.’ ”  Sallis, 507 F.3d at 649 (quoting Coney, 456

F.3d at 855-856 (quoting <u>Linkous</u>, 285 F.3d at 719).  <u>See also</u> <u>Ehrmann</u>, 421

F.3d at 780.  "[T]he constitutional reasonableness of a traffic stop does not

depend on the actual motivations of the officer involved, and the subjective

intentions of the officer making the stop are irrelevant in determining the

validity of the stop."  <u>United States v. Herrera-Gonzales</u>, 474 F.3d 1105, 1109

(8th Cir. 2007).  <u>See also</u> <u>United States v. Andrews</u>, 465 F.3d 346, 347 (8th Cir.

2006) (per curiam) ("[T]he fourth amendment is not violated if an objectively

good reason for a traffic stop exists, whatever the actual subjective motive of

the officer making the stop may have been.").

     Exceeding the speed limit provides a justifiable reason for a traffic stop,

even if the officer is acting on a tip that the vehicle is involved in transporting

drugs and said tip would not, by itself, provide justification for the stop.  <u>See</u>

<u>Sallis</u>, 507 F.3d at 649-650 (citing <u>United States v. Stapleton</u>, 10 F.3d 582,

583-584 (8th Cir. 1993)).  This is true even if the officer would not ordinarily

stop a car exceeding the speed limit by only five to ten miles per hour.  <u>Id.</u>

     If the officer has an objectively reasonable belief that the suspect has

violated traffic law, even if the officer is mistaken, reasonable suspicion for the

stop can still exist.  <u>United States v. Bueno</u>, 443 F.3d 1017, 1024-1025 (8th Cir.

2006) (citing <u>United States v. Smart</u>, 393 F.3d 767, 770 (8th Cir. 2005)); <u>United</u>

<u>States v. Martin</u>, 411 F.3d 998, 1000-1002 (8th Cir. 2005).

After an initial stop, the resulting detention must be no longer than reasonably necessary and must be reasonably related to the circumstances which initially justified the stop.  Illinois v. Caballes, 543 U.S. 405, 407 (2005); United States v. Sharpe, 470 U.S. 675, 685-687 (1985); Florida v. Royer, 460 U.S. 491, 500 (1983).  There are no rigid time limitations on a Terry stop. Sharpe, 470 U.S. at 685; United States v. Watts, 7 F.3d 122, 125 (8th Cir. 1993).  Rather, the court is to consider the purposes for which law enforcement stopped the vehicle as well as the time reasonably needed to effectuate those purposes.  Sharpe, 470 U.S. at 685.  The court must consider whether "the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."  Id. at 686.  It is the government's burden to prove that a detention pursuant to reasonable suspicion was sufficiently limited in scope and duration.  Royer, 460 U.S. at 500.

The Eighth Circuit has held that a "reasonable investigation of a traffic stop may include checking the driver's license and registration, asking the driver to step out of the vehicle, asking the driver to sit in the patrol car, and requesting the driver's destination and purpose.  United States v. Gomez Serena, 368 F.3d 1037, 1040 (8th Cir. 2004) (citing United States v. Gregory, 302 F.3d 805, 809 (8th Cir. 2002); United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994)); United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) (citing

United States v. Beck, 140 F.3d 1129, 1134 (8th Cir. 1998)).  See also Caballes, 543 U.S. at 407 (a seizure justified by the interest in issuing a ticket to the driver "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."); United States v. Gallardo, 495 F.3d 982, 987 (8th Cir. 2007).

If an officer's permitted initial investigatory steps arouse reasonable suspicions, the officer is "entitled to expand the scope of the stop and ask questions not directly related to the initial traffic stop."  Gomez Serena, 368 F.3d at 1040; see also Ramos, 42 F.3d at 1163 (traffic stop may not be expanded unless "objective circumstances supply the trooper with additional suspicion.").  "An investigative stop can grow out of a traffic stop so long as the officer has reasonable suspicion of criminal activity to expand his investigation, even if his suspicions were unrelated to the traffic offense that served as the basis of the stop."  Gomez Serena, 368 F.3d at 1041 (citing United States v. Long, 320 F.3d 795, 799-800 (8th Cir. 2003)).

If the investigatory stop is not supported by reasonable suspicion or if the officers exceed the proper scope of the stop, then any evidence derived from the stop must be excluded from trial.  Wong Sun v. United States, 371 U.S. 471, 484 (1963); Wheat, 278 F.3d at 726.

Thus, this traffic stop must be analyzed in two parts:  (1) whether there was reasonable suspicion on the part of Trooper Swets to stop the defendants'

vehicle in the first place, and (2) whether there was reasonable suspicion to continue to detain the defendants once Trooper Swets stopped them.

### 1.    Reasonable Suspicion for the Initial Stop of Defendants

Under the applicable law discussed above, it is beyond question that, if defendants were speeding, Trooper Swets' stop of their vehicle was supported by reasonable suspicion sufficient to make the stop legal.   Sallis, 507 F.3d at 649; Coney, 456 F.3d at 855-856; Ehrmann, 421 F.3d at 780; Linkous, 285 F.3d at 719.  The defendants attempt to undermine the basis for their stop with the testimony of their expert accident reconstructionist, Lewis Dirks, who opined that Trooper Swets had insufficient time to make an "eyeball" assessment that the defendants were exceeding the speed limit.  Nevertheless, Mr. Dirks' testimony does nothing to shake the credibility of Trooper Swets' testimony that he locked the defendants' vehicle on his radar doing 78 miles per hour, in excess of the posted 75-mile per hour speed limit nor does Mr. Dirks' testimony suggest that Trooper Swets' radar machine reading was in any way unreliable.  To the contrary, Mr. Dirks testified that the radar machine should be relied upon instead of a lay estimate of speed.  The court finds Trooper Swets' testimony regarding the use of his radar machine and its reading to be credible and uncontradicted by any other testimony.

Since speeding, however slightly, provides a justifiable basis for the stop, even if the officer is motivated by subjective intent separate and apart from a

36

desire to stop speeders on the highway, the stop by Trooper Swets of the defendants was supported by reasonable suspicion.  Sallis, 507 F.3d at 649-650 (citing Stapleton, 10 F.3d at 583-584); Herrera-Gonzales, 474 F.3d at 1109; Andrews, 465 F.3d at 347.  Accordingly, the court will not suppress the evidence obtained from the defendants' vehicle on the basis that the initial stop was invalid.

### 2.    Continued Detention

However, this does not end the inquiry.  As stated above, an officer who is justified in making an initial stop may detain the suspects beyond the initial reason for the stop only if there is reasonable suspicion that criminal activity is afoot.  Gomez Serena, 368 F.3d at 1040-1041; Long, 320 F.3d at 799-800. Here, the reasons Trooper Swets articulated for his continued detention of defendants once he stopped the defendants for speeding were all reasons based on information relayed to him by Captain Hodge: that the defendants were driving a third-party's vehicle, that they could not give the name of the owner of the vehicle, that they had insufficient luggage for a trip of one week's duration, that a drug dog (first Captain Hodge's dog, then Trooper Swets' dog) had alerted to the presence of drugs in the vehicle, that the defendants had multiple cell phones with them, that there was a tube of silicone and two screwdrivers on the floor of the vehicle, and that the defendants' reaction when asked about the presence of methamphetamine in the vehicle was "suspicious" because they

37

looked away when answering "no."  In some instances, Trooper Swet obtained

this information directly from the defendants, but in the case of each one of

these "criminal indicators," Trooper Swets' information originally stemmed from

his communication with Captain Hodge.  All Trooper Swets did was reestablish

the presence of factors he already knew to exist.

The Eighth Circuit has held that successive stops of a suspect based on

the same exact information is violative of the Fourth Amendment.  See United

States v. Garcia, 23 F.3d 1331, 1335-1336 (8th Cir. 1994).  In Garcia, a

Nebraska State Patrol Trooper stopped defendants' vehicle after observing the

vehicle swerve on to the shoulder of Interstate 80 three times.  Id. at 1332-

1333.  The officer performed a routine traffic stop, ran a records check on the

driver and the passenger, issued a warning ticket, and found out neither

defendant had an active warrant for his arrest.  Id. at 1333.  Thereafter, the

officer asked for a records check with the El Paso Intelligence Center.  Id.

While waiting for a response, the trooper asked the defendants if they had any

weapons or narcotics with them, to which they answered "no."  Id.  He then

asked if defendants would allow the trooper to search the back of their truck,

which defendants agreed to do.  Id.  The trooper made a cursory examination of

the cargo compartment, noted that it was fully loaded with furniture boxes in

conformity with defendants' story that they were moving funiture to El Paso.

Id.  The trooper noted that there was no visible luggage or clothing.  Id.  The

trooper asked for backup to help him search the truck, but when he was informed that it would take approximately ten minutes for another officer to arrive, the trooper released the defendants and allowed them to resume their trip.  Id.

Shortly after releasing the defendants, the trooper received a response back from the El Paso Intelligence Center that the passenger in the vehicle had been arrested by the border patrol in the past on a firearms violation.  Id.  Upon receiving this information, the trooper called ahead to another trooper, described the defendants' vehicle, and asked the second trooper to intercept the defendants.  Id.  The second trooper stopped the vehicle without observing any new traffic infractions.  Id. at 1333-1334.  The first trooper arrived six or seven minutes later, and asked the defendants if he still had their permission to search their truck.  Id. at 1334.  They said yes.  Id.  The trooper then searched the vehicle and found a large amount of money and cocaine.  Id. at 1332, 1334.

The Eighth Circuit held that the evidence obtained from the search must be suppressed as the fruit of an illegal stop and detention.  Id. at 1334-1336.  Here, although the first stop of the defendants was justified due to defendants' vehicle swerving repeatedly, the court noted that the trooper had no new information to justify the second stop except the information about the passenger's past arrest.  Id. at 1336.  This was simply not enough, even in

conjunction with the other information known to the officer, to provide a reasonable, articulable suspicion that defendants were engaged in criminal activity.  Id. at 1336.  In so holding, the court held that there is no *per se* prohibition against successive investigatory stops, but that the second stop is "inherently more instrusive and coercive than the first."  Id. at 1335 n. 2.  The court noted that it was "not empowered to suspend constitutional guarantees so that the government can more effectively fight the war on drugs."  Id. at 1336 (citing Florida v. Bostick, 501 U.S. 429 (1991)).

The case of United States v. Peters, 10 F.3d 1517 (10th Cir. 1993), was cited approvingly by the Eighth Circuit in Garcia.  Garcia, 23 F.3d at 1335 n.2.  The Peters case involves facts even closer to those in the instant case.  In Peters, a police officer on the staff of the Flagstaff Arizona Police Department stopped the defendants' vehicle after seeing it cross the center line of the highway twice.  Peters, 10 F.3d at 1519.  The officer's suspicions were aroused when, in conducting his routine traffic stop procedures, the defendants acted "extremely  nervous" and were "shaky, sweaty, and kept looking at each other side to side quite often."  Id.  The officer issued the driver a warning ticket, and then asked permission to search the truck, which the driver gave.  Id.  After a thorough search, the officer turned up no evidence of drugs or other illegal activity.  Id.  After finishing the search, the officer released the defendants and allowed them to continue on their way.  Id.

40

However, the officer was not satisfied with the results of his search and continued to suspect that the defendants were involved in drug activity.  Id.  He called the information about the defendants to his lieutenant, who relayed the information to the Drug Enforcement Administration, who in turn relayed the information to a border patrol agent at Albuquerque, New Mexico.  Id. at 1520. The DEA gave the border patrol agent a description of the truck and its occupants, as well as the details learned by the Flagstaff officer.  Id. Thereafter, the border patrol agent calculated the time necessary for the defendants to reach Albuquerque, then went looking for the defendants.  The officer spotted the defendants' vehicle on the highway and pulled in behind them, whereupon the defendants' vehicle abruptly changed lanes.  Id.  The officer then pulled even with the defendants' vehicle and stared at them.  Id. The driver kept looking straight ahead and kept a firm grip on the steering wheel while the passenger faced straight ahead, but kept glancing at the officer out of the corner of his eye.  Id.

The officer then proceeded to stop the defendants' vehicle based on this "nervous behavior."  Id.  Based on a subsequent consent search of the driver's wallet, and the discovery of a forged social security card, the defendants were arrested and charged with immigration offenses.  Id.

In support of the second traffic stop, the government argued that four grounds created a reasonable, articulable suspicion:  (1) the agent knew that

41

the defendants were of Nigerian ancestry, (2) the defendants' truck made an abrupt lane change when the agent began following it, (3) the agent had been informed that the defendants had acted nervously when they had been stopped in Flagstaff, and (4) the defendants acted nervous when the agent pulled even with their truck. Id. at 1521. The Tenth Circuit rejected the government's assertion of a reasonable, articulable suspicion. Id.

First, the court noted that the nervousness in Flagstaff and the defendants' Nigerian ancestry were facts known to the officer in Flagstaff and were, therefore, not new information to the border patrol agent. Id. The court also noted that the defendants' lane change was legal and could not provide a reasonable suspicion of an immigration violation. Id. Finally, as to the alleged nervousness of the defendants when the border patrol officer pulled even with them, the court stated that "[w]hile a person's nervous behavior may be relevant, we are wary of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials. . ." Id. (quoting United States v. Hall, 978 F.2d 616, 621 n.4 (10th Cir. 1992)). The court held that the defendants' behavior was as easily attributable to the driver's caution due to his inexperience in operating a large, rented moving truck or to the fact that the defendants had already been stopped once that day, searched to no avail, and might now be wary of law officers. Id. at 1522.

42

More significant than the fact that there were alternative explanations for the defendants' "nervousness," the court noted that nervous behavior had already been exhausted as a ground to support the second stop.  Id.   Citing Terry and United States v. Place, 462 U.S. 696, 717 (1983), the court held that when an officer observes unusual conduct leading him to believe there is criminal activity afoot, he is authorized to investigate but, if probable cause is not developed during the Terry stop, the officer must release the suspect.  Id. The court then made the following statement which is particularly applicable to the instant facts:

> Of course, a second officer **who is unaware of the fruitless search conducted earlier** may initiate his own investigation based on the same "suspicious" behavior that was exhausted by the first officer's failed investigation.  The officer who performed the original investigation, however, may not release the suspect as required by Terry and Place, wait until he has traveled down the road a few miles, and then make a second Terry stop based solely on the conduct that has already proved to be illusory.  Similarly, the officer cannot circumvent Terry and Place by calling upon a different officer to make the second intrusion in his stead.
>
> In this case, [the Flagstaff officer] became suspicious and decided to search for drugs solely because of the defendants' nervous behavior.  He checked the defendants' driver's licenses, and both were reported as valid.  He performed a search of the vehicle and discovered nothing incriminating. . . .  Having no grounds upon

43

which he could continue to detain the suspects, [he] allowed them
to continue on their way.  At this point, nervous behavior had been
exhausted as a ground for suspicion, and thus, it would have been
unreasonable for [the first officer] to have stopped the suspects
again a few minutes later based solely on a claim that they were
once again acting nervous in his presence.  ***Likewise, it would
contravene the teachings of <u>Terry</u> and <u>Place</u> to allow [the
border patrol agent] to make the second stop based on
nothing more than the information provided him about [the
first officer's] encounter and a repeat occurrence of the same
"suspicious" conduct that [the second officer] knew had
proved illusory at the earlier stop.***

<u>Id.</u> at 1522-1523 (emphasis supplied).  Based on the illegality of the second

officer's stop of the defendants, the Tenth Circuit held that the fruits of the

subsequent consent search and the subsequent statements obtained should be

suppressed under <u>Brown v. Illinois</u>, 422 U.S. 590, 603-604 (1975), and <u>Wong</u>

<u>Sun</u>, 371 U.S. at 487-488.  <u>Peters</u>, 10 F.3d at 1523.

The court concludes that Trooper Swets' continued detention of the

defendants in this case was illegal under the above precedent.  Trooper Swets

had a right to stop the vehicle for speeding, as discussed above, however, he

had to have a reasonable, articulable suspicion to expand the traffic stop and

continue to detain the defendants once he stopped them.  The only information

Trooper Swets had to rely upon as his basis for continued detention of the

defendants was all the same information that Captain Hodge had relayed to

44

him.  No new information was discovered or revealed to Trooper Swets to justify the continued detention.  Once the first officers, Captain Hodge and Trooper Boumeister in Wyoming, had exhausted those grounds for detaining defendants, they could not be subject to serial detentions by other officers based on the same information.   Place, 462 U.S. at 717; Terry, 392 U.S. at 30; Garcia, 23 F.3d at 1334-1336; Peters, 10 F.3d at 1522-1523.[8]  Cf. United States v. Ilazi, 730 F.2d 1120, 1125 (8th Cir. 1984) (stating that successive investigatory stops, though each limited sufficiently in duration and scope to satisfy Terry, can collectively become "so intrusive as to be tantamount to an arrest.").  See also United States v. Morin, 665 F.2d 765, (5th Cir. 1982), abrogated on other grounds as recognized in United States v. Corral-Franco,

---

[8]The Peters and Garcia cases are thus distinguishable from United States v. Jacobsen, 391 F.3d 904, 905-906 (8th Cir. 2004).  In Jacobsen, officer number one had a reasonable, articulable suspicion justifying the stop of defendant's vehicle, and he called ahead to officer number two, asking officer number two to effectuate a Terry stop without telling officer number two the grounds for the stop.  Id.  The defendant had committed no traffic violation and no independent grounds were known to officer number two to justify the stop.  Id.  The Eighth Circuit held that the stop was proper under Terry because the first officer had grounds for the stop and it was not necessary that the second officer be fully informed of the grounds.  Id. (citing United States v. Hensley, 469 U.S. 221, 231-233 (1985) (holding that police could effectuate a Terry stop on the basis of a "wanted flyer" even though the flyer did not articulate the grounds for the reasonable, articulable suspicion of criminal activity)).  The distinction between Jacobsen and this case is that in Jacobsen, officer number one would have been justified in making the Terry stop that he asked officer number two to carry out.  Here, Captain Hodge and Trooper Boumeister would not have been justified in continuing defendants' detention following a stop for speeding absent new grounds for doing so, and they could not circumvent the requirement of Terry and Place by asking Trooper Swets to act in their stead.

848 F.2d 536 (5th Cir. 1988) (holding that a second Terry stop by a second set of police officers but based on the same information as the first Terry stop rendered the second stop an arrest for which probable cause was required; since officers had only a reasonable suspicion and not probable cause, the second serial stop was an illegal arrest).

It is true that an alert by a drug dog has been held to provide probable cause for a warrantless search of an automobile if the drug dog sniff occurs during the course of an ordinary traffic stop.  See United States v. Peralez, 526 F.3d 1115, 1122 (8th Cir. 2008).  However, Captain Hodge's dog had already alerted and this information was relayed to Trooper Swets.  If this line of authority is to be applied literally, then road blocks could have been constructed every 50 miles and, so long as a drug dog alerted at each stop, defendants could have been lawfully detained for hours at each while law enforcement continued to search.[9]

There is an unspoken inclination that can sometimes be discerned in court cases that an illegal search should be justified because, after all, drugs were discovered in the defendants' vehicle.  However, imagine instead that

_____

[9]Of course, this presupposes that each time defendants would commit anew a traffic violation that justifies the initial stop.  As Wayne La Fave has observed, however, once a driver is singled out as "suspicious" for some reason, "it is only a matter of time before some technical or trivial offense produces the necessary excuse for a traffic stop."  See Wayne R. La Fave 4 Search & Seizure: A Treatise on the Fourth Amendment, § 9.3 at 359 (4th ed. 2004).

there was an innocent explanation for Captain Hodge's dog's alert, such as the fact that the Acura had been used for transporting drugs by some previous owner, though it no longer had any illegal contraband in it.  The specter of law enforcement continually and serially stopping that vehicle on the basis of a drug dog's alert at each stop would be justified by the proposition that "a drug dog's alert provides probable cause," but there can be no doubt that such conduct would be in violation of the strictures of the Fourth Amendment.

Analyzed another way, if Captain Hodge had packed up Brix in the back of his patrol vehicle and driven ahead of defendants, intercepted them after observing a traffic violation, and Brix alerted again, Captain Hodge would not have a new reasonable, articulable suspicion for detaining defendants again and searching again because he had already used this factor once and exhausted it as a basis for a detention and search.  Peters, 10 F.3d at 1522-1523.  Captain Hodge cannot circumvent the Fourth Amendment by simply arranging for a second officer and drug dog to intercept the defendants again and search again in his stead on the same basis as the first search.  Id.

Furthermore, this conclusion is based on the unique facts of this case. In between the time Captain Hodge and Trooper Boumeister released defendants and the time Trooper Swets stopped the defendants, approximately 38 minutes had elapsed.  Testimony established that the distance between these two points would typically take approximately 40 to 45 minutes to travel.

47

Therefore, there are no facts to suggest that, in between the first drug dog's alert and the second drug dog's alert, the defendants could have made any stops to pick up or drop off drugs.  Had the timing been such so as to suggest that defendants could have engaged in this type of activity in between the two dogs' alerts, this court's conclusion as to whether the second dog's alert provided Trooper Swets with a reasonable, articulable suspicion sufficient to expand the traffic stop might very well be different.

No matter how much courts wish to eliminate the scourge of illegal drugs from this country, "[w]e are not empowered to suspend constitutional guarantees so that the government can more effectively fight the war on drugs." Garcia, 23 F.3d at 1336.  Trooper Swets' continued detention of the defendants was not supported by a reasonable, articulable suspicion because it was based solely on factors that had already been exhausted by Trooper Boumeister and Captain Hodge as a basis for the search and communicated to Trooper Swets. Garcia, 23 F.3d at 1335-1336; Peters, 10 F.3d at 1522-1523.

The court notes that separate and apart from the fact that there was not a reasonable, articulable suspicion justifying Trooper Swets' continued detention, the detention was unlawful for another reason: it was improperly extended.  In Peralez, 526 F.3d at 1117-1121, a trooper detained two defendants for sixteen minutes before getting his drug dog out of his car, using this time to ask questions of the defendants intended to elicit information to

48

support or dispel the officer's suspicions that the defendants were engaged in drug trafficking. The court held that the trooper's posing of non-routine questions unnecessarily prolonged the traffic stop "beyond the time reasonably required" to complete the purpose of the stop. Id. at 1121.

Here, Trooper Swets obtained the defendants' driver's licenses almost immediately at the inception of the traffic stop. However, Trooper Swets was so intent on asking non-routine questions designed to establish the same facts that Captain Hodge and Trooper Boumeister had elicited from the defendants, that he failed to call in Mr. Hernandez-Mendoza's driver's license to dispatch until 8 ½ minutes had elapsed, and he did not call in Mr. Martinez's driver's license information to dispatch until after 30 minutes had elapsed. Although Trooper Swets was entitled to call in both of the defendants' driver's license information and receive a response from dispatch before releasing the defendants, he was required to do so in a reasonably prompt fashion. Sharpe, 470 U.S. at 686; Caballes, 543 U.S. at 407; Gomez Serena, 368 F.3d at 1040. His prolonging of the routine part of this traffic stop so that he could ask his non-routine questions to set up a basis for continuing to detain the defendants violates the Fourth Amendment. Peralez, 526 F.3d at 1121.

The court also specifically finds that this continued detention of the defendants was not consensual. Mr. Hernanadez-Mendoza was asked to sit in the front of Trooper Swets' patrol car and never given permission to exit that

49

vehicle until Trooper Swets commanded him to do so.  Mr. Martinez was asked
to exit the Acura and stand in the ditch.  Trooper Swets removed the key from
the ignition of the Acura.  Very shortly thereafter, Trooper Swets handcuffed
Mr. Martinez.  During this exchange, Trooper Swets suggested that a failure to
obey his commands might result in Mr. Martinez being attacked by Karlo.
Then Trooper Swets made both defendants stand between the two vehicles,
facing away from each other, and instructed them not to talk to each other.
This was clearly not a consensual encounter.  See Jones, 269 F.3d at 925
(citing Mendenhall, 446 U.S. at 554).

### 3.    Whether the Exclusionary Rule Applies to Prevent the Introduction of Evidence Seized or Statements Made

Concluding that Trooper Swets' continued detention of the defendants
was unlawful does not end the inquiry, however.  Another level of analysis
determines whether any evidence should be excluded as a result of this
constitutional violation.  Two categories of evidence were obtained by law
enforcement as a result of the illegal detention of defendants:  (1) physical
evidence taken from the Acura and (2) Eddie Martinez' Mirandized statement.
The court will separately address whether either category of evidence must be
suppressed.

### a.    Physical Evidence

"The exclusionary rule has traditionally barred from trial physical,
tangible materials obtained either during or as a result of an unlawful

invasion." Wong Sun, 371 U.S. at 485 (citing Silverman v. United States, 365 U.S. 505 (1961)).  The court must consider three factors to determine whether the physical evidence found in the Acura was the fruit of the Fourth Amendment constitutional violation, or whether it was obtained by "means sufficiently distinguishable to be purged of the primary taint." Wong Sun, 371 U.S. 487-488.  Those three factors are:  (1) the temporal proximity of the discovery of the evidence to the Fourth Amendment violation; (2) the existence of intervening causes between the violation and the discovery; and (3) the purpose or flagrancy of the official misconduct.  Brown, 422 U.S. at 603-604.  Of these factors, the purpose and flagrancy of police misconduct is "the most important factor because it is directly tied to the purpose of the exclusionary rule–deterring police misconduct." United States v. Simpson, 439 F.3d 490, 496 (8th Cir. 2006) (citing United States v. Reed, 349 F.3d 457, 464-465 (7th Cir. 2003)).

In the Wong Sun case, police violated the Fourth Amendment when they entered the residence of James Wah Toy and arrested him without probable cause.  Id. at 473-475, 484-486.  As a result of this constitutional violation, the Court applied the exclusionary rule to suppress statements Toy made while the officers were in his home illegally, and to suppress heroin obtained from Johnny Yee within one hour of the illegal arrest of Toy that derived from Toy's statements.  Id. at 473-476, 485-488.  The Court held that the circumstances

did not show that the police discovered the heroin from an independent source, nor that the connection between the constitutional violation and the discovery of the heroin had "become so attenuated as to dissipate the taint" of the constitutional violation.  Id. at 487.  Rather, the Court held that the heroin was obtained through exploitation of the original Fourth Amendment violation.  Id. at 488.

In United States v. Guevara-Martinez, 262 F.3d 751, 752 (8th Cir. 2001), Guevara-Martinez was subject to an illegal traffic stop and detention, during which methamphetamine was discovered.   He was then arrested and his fingerprints were taken.  Id.  Although indicted on drug charges, those charges were dismissed when the district court granted defendant's motion to suppress. Id.  Guevara-Martinez was then indicted on immigration offenses which came to light as a result of the police having taken his fingerprints.  Id.  The Eighth Circuit held that the fingerprint evidence should be suppressed because, although police did not arrest Guevara-Martinez for the sole purpose of obtaining his fingerprints, nevertheless the fingerprints were obtained "by exploitation" of the primary illegality–the illegal traffic stop, detention, and arrest–and nothing had intervened which would "purge the primary taint" of that constitutional violation.  Id. at 755-756 (citing Wong Sun, 371 U.S. at 488).  The court held that "[e]vidence can be obtained 'by exploitation' of an

unlawful detention even when the detention is not for the sole purpose of gathering that evidence." Id. at 755.

In the Peralez case, discussed above, the Eighth Circuit held that physical evidence obtained from a vehicle that had been unlawfully detained need not be suppressed unless the constitutional violation was "at least a but-for cause of obtaining the evidence." Peralez, 526 F.3d at 1121.  In that case, the trooper had indicated to the defendants that he was going to run his drug dog around the car no matter what the defendants' responses to the trooper's questions were.  Id. (stating that the trooper said "when" I run my drug dog around your car rather than "if").  Therefore, the court held that because the trooper was going to run his dog around the defendants' car anyway, the extended detention was not the cause of the search and the finding of evidence. Id.  In other words, the court held that the evidence would have been discovered by the trooper even absent the constitutional violation.  Id.  Under such circumstances, the exclusionary rule does not apply.  Id.

The same cannot be said here.  As discussed above, under the unique facts of this case, Trooper Swets' dog's alert did not provide Trooper Swets with probable cause to search or continue to detain the defendants because the fact that a drug dog would alert was already known and exhausted by Captain Hodge and Trooper Boumeister in Wyoming.  The alert of Karlo was not a

separate, intervening fact that saves the illegal detention and the Fourth Amendment violation from being a "but-for" cause of obtaining the evidence.

Furthermore, Trooper Swets used the word "if" when talking about running his drug dog around the defendants' car.  He did not say, as the trooper in Peralez did, "when I run my dog around your car."  Here, there is no evidence from which the court can conclude that the search was inevitable–there is no evidence that the search was going to happen separate and independent of the constitutional violation.

Finally, as the court in Guevara-Martinez found to be significant, here the physical evidence was obtained during the illegal detention.  Guevara-Martinez, 262 F.3d at 756.  Therefore, the facts in this case show that the constitutional violation–the illegal detention–is the "but for" cause of obtaining the evidence.  Trooper Swets obtained the evidence "by exploitation" of the primary illegality.  Wong Sun, 371 U.S. at 488; Guevara-Martinez, 262 F.3d at 755-756.

A suspect's giving of voluntary consent to search has sometimes been found to purge the taint of an illegal detention.  See United States v. Lyton, 161 F.3d 1168, 1171 n.3 (8th Cir. 1998); Ramos, 42 F.3d at 1164.  However, here, Trooper Swets did not obtain defendants' consent to search.  Rather, the trooper proceeded to search after receiving a positive alert from his drug dog.  Under such circumstances, courts have excluded evidence obtained from the

54

exploitation of an illegal detention. Brown, 422 U.S. 602-606; United States v. Guevara-Martinez, 262 F.3d 751, 755-756 (8th Cir. 2001). Thus, the court concludes that the physical evidence seized from defendants' vehicle should be suppressed as fruits of the illegal detention.

### b.   Eddie Martinez's Statement

The conclusion that the physical evidence from the Acura must be suppressed does not dictate that Eddie Martinez's statement to DCI Agent Chad Evans must also be suppressed.[10] The court must reconsider and reapply the three factors discussed above to Mr. Martinez's statement to determine if suppression is required. In addition to those three factors, the court also considers whether the defendant received and waived Miranda warnings before making the statement. Brown, 422 U.S. at 603-604.

The giving of Miranda warnings following a constitutional violation and before the taking of a suspect's statement does not, by itself, purge the taint of the original violation. Brown, 422 U.S. at 601-603. Whether the statement was the product of a clear act of free will on the part of the defendant and not

---

[10]There were actually two statements that were made during and after the illegal detention: (1) the conversation between both defendants that was recorded as they sat in the back of Trooper Allen's patrol car, and (2) Eddie Martinez's statement to DCI Agent Chad Evans. The taped conversation between the defendants, as discussed earlier in this opinion, was not the product of police interrogation at all, let alone the product of purposeful or flagrant police misconduct. Therefore, the court will not suppress that conversation on the basis of the illegal detention.

the fruit of the constitutional violation depends on whether a sufficient lapse in time has occurred between the constitutional violation and the interrogation, whether there was a change in location as to the interrogation, whether the interrogator is the same person who violated the defendant's constitutional rights, and the flagrancy and purpose of the government's misconduct in the initial illegality.  Oregon v. Elstad, 470 U.S. 298, 310 (1985); Taylor v. Alabama, 457 U.S. 687 (1982); Brown, 422 U.S. at 603-604.

In the Wong Sun case itself, Wong Sun's Fourth Amendment rights had been violated by an arrest without probable cause.  Wong Sun, 371 U.S. at 491-492.  He was arraigned, then released on his own recognizance, and returned to the police station several days later and gave a statement.  Id.  The Supreme Court held his statement admissible, despite the Fourth Amendment violation, because "the connection between the arrest and the statement had 'become so attenuated as to dissipate the taint.' " Id. at 491 (citing Nardone v. United States, 308 U.S. 338, 341 (1939)).

In the Brown case, Richard Brown's Fourth Amendment rights had been violated by an illegal arrest and subsequent detention at approximately 7:45 p.m.  Brown, 422 U.S. at 592-594.  Thereafter, he was transported for approximately 20 minutes in a patrol car to a police station.  Id. at 593-594.  Once there, the same officers who had just arrested him gave him Miranda warnings and then proceeded to interrogate Brown, who waived his Miranda

56

rights and gave a statement.  Id. at 594.  Brown was kept in custody until approximately 2:00 a.m. that following day, when he was interrogated a second time, this time by a prosecuting attorney, who also advised Brown of his Miranda rights prior to interrogating him.  Id. at 594-596.

The Court held that both statements should be suppressed.  Id. at 604-605.  In reaching this conclusion, the court noted that the first statement was given less than two hours following Brown's illegal arrest and that "there was no intervening event of significance whatsoever."  Id. at 604.  Furthermore, the Court emphasized that the Fourth Amendment violation in this case "had a quality of purposefulness," noting the obvious impropriety of the arrest and the officers' virtual concession of that fact at the suppression hearing.  Id. at 605.  The Court also held that "the second statement was clearly the result and the fruit of the first."  Id.

In Carter, 884 F.2d at 372-373, the court held that a statement taken after duly-given Miranda warnings had to be suppressed as "fruit of the poisonous tree" where the interrogators who had violated Carter's constitutional rights were the same interrogators who obtained the post-Miranda statement and there was no passage of time between the constitutional violation, the Miranda warning, and the post-Miranda statements, all of which "occurred as a part and parcel of a continuous process."  See also United States v. Reinholz, 245 F.3d 765, 779-780 (8th Cir.

57

2001) (affirming suppression of defendant's statement where he had been arrested illegally, detained with officers in patrol car for 25-minute ride, and made several statements to these same officers both before and after receiving Miranda warnings, but all following directly on the heels of the arrest with no change in interrogators, location, or intervening lapse of time); United States v. Chavez, Crim. No. 00-50099-KES, at page 4 (D.S.D. April 23, 2001) [Docket No. 42] (suppressing defendant's statements made during an illegal detention where the statements occurred during the traffic stop, in response to questions from the same officer that committed the Fourth Amendment violation, and no Miranda warnings or intervening factors occurred).

In United States v. Vega-Rico, 417 F.3d 976, 980 (8th Cir. 2005), where the defendant gave a Mirandized statement four days after his Fourth Amendment violation, the interview was conducted in a different location than the violation, and the interrogator was a different person from a different law enforcement agency which had had no involvement in the Fourth Amendment violation, the court held that the taint of the constitutional violation had been purged and that the defendant's statement was admissible.

In Black Bear, 422 F.3d at 664-665, the court refused to suppress a Mirandized statement obtained after an earlier, unwarned statement, where the second warned interrogation took place 24 hours after the first, an additional law enforcement officer was present at the second interview, the two interviews

58

took place in different locations, there was no cross-referencing overlap between the two interrogations, the interrogator in the second interview did not treat it as a continuation of the first interview, and the defendant was not under police control during the intervening 24 hours.

As to the element of purposeful and flagrant police misconduct, the Eighth Circuit noted that courts have found such conduct where the impropriety of the conduct was obvious and the official knew at the time that he was likely violating the suspect's rights or where the misconduct was "investigatory in design and purpose and executed 'in the hope that something might turn up.' " Herrera-Gonzalez, 474 F.3d at 1113 (quoting Simpson, 439 F.3d at 496 (quoting Brown, 422 U.S. at 605).  However, a mistake, even if unreasonable, is not alone sufficient to establish flagrant conduct.  Id.

In Herrera-Gonzalez, the Eighth Circuit refused to find a purposeful and flagrant violation of the defendant's Fourth Amendment rights where the officer had difficulty in verifying the defendant's plates and driver's license because these things gave the officer a reason to be suspicious.  Id. at 1113-1114.  In Vega-Rico, the court found there was no flagrant official misconduct where the police relied upon an unreliable drug dog as the basis for their search.  Vega-Rico, 417 F.3d at 980.  Where the officer cannot be said to have acted purposefully in violating the defendant's rights, even where the arrest and statement are close in time and there are no intervening factors, the Eighth

Circuit has refused to apply the exclusionary rule.  See Ramos, 42 F.3d at 1164.

The Eighth Circuit has said of the element of temporal proximity that ten minutes between the constitutional violation and the act of giving consent was neither conclusively too short a period of time nor conclusively long enough of a period to have purged the taint of the original violation.  Herrera-Gonzalez, 474 F.3d at 1111-1112.  The court held that consent given a short time after an illegal stop can be "sufficient to purge the taint if other circumstances indicate that the consent was sufficiently an act of free will."  Id. at 1112 (citing United States v. Palacios-Suarez, 149 F.3d 770, 772-773 (8th Cir. 1998)).  In United States v. Becker, 333 F.3d 858, 862-863 (8th Cir. 2003), a lapse of 49 minutes between the defendant's unlawful detention under the Fourth Amendment and his voluntarily giving consent to a search was held sufficient time to have allowed the taint to be purged.

In an analogous case, a plurality of the Supreme Court held that a second, Mirandized statement must be suppressed when it was preceded by an earlier, unwarned statement, where the facts show a deliberate intent on the part of interrogators to circumvent and undermine Miranda and the circumstances of the giving of the Miranda warning were unlikely to have alerted the suspect that his or her earlier statement was inadmissible, and that he or she had a real choice about whether to give the second statement.  See

60

Missouri v. Seibert, 542 U.S. 600, 604-618 (2004) (opinion of Stevens, J.); and id. at 619-622 (opinion of Kennedy, J., concurring in the judgment).  As under the Brown analysis, the plurality in Seibert found the officer's intent to violate the suspect's rights to be of paramount importance.  Id. at 611-617 (opinion of Stevens, J.) (emphasizing that this case presented facts indicating that the strategy of the officers was to deliberately undermine and circumvent Miranda, while the conduct of the officer in Elstad indicated "a good-faith Miranda mistake"); and id. at 618-622 (Breyer, J., concurring) (emphasizing that the facts in Seibert showed a deliberate violation of Miranda by police, while the facts of Elstad did not).

Also, like the Brown analysis, the Seibert plurality held that Mirandized statements following a statement taken in violation of Miranda could still be admissible where sufficient intervening facts existed that established the probable effectiveness of the Miranda warnings when given, such as a change in location for the second interrogation, a change in identity of the interrogators, a lapse of time, and an absence of any cross-pollination between the first and second statements so that the suspect would understand that the second statement stood on its own and was not a continuation of the first statement.  Id. at 611-617 (opinion of Stevens, J.); and id. at 618-622 (Breyer, J., concurring).

Applying the above case law, the court concludes that Mr. Martinez's statement should not be suppressed as fruit of the illegal detention.  First, Agent Evans fully advised Mr. Martinez of his <u>Miranda</u> rights before taking his statement.  There is absolutely no fact in the record that would indicate that Mr. Martinez's waiver of his <u>Miranda</u> rights was unintelligent or coerced in any way.  In fact, Mr. Martinez has not raised any issue with regard to the voluntariness of his waiver of rights or of the voluntariness of the statement itself.  Thus, this case is unlike that of <u>Flores-Sandoval</u>, 422 F.3d at 713-715, where the Eighth Circuit affirmed the suppression of a defendant's statement taken while he was unlawfully detained because there was no showing by the government that the defendant had been given <u>Miranda</u> warnings and waived them.

Second, the temporal proximity is not dispositive one way or the other. Trooper Swets stopped the defendants at 4:37:57 p.m.  Agent Evans arrived at the South Dakota Highway Patrol office in Rapid City to interview Mr. Martinez at approximately 6 p.m., which would be approximately 90 minutes after the stop.  This is neither so long a period as to have presumptively purged the taint, nor is it such a short period as to be able to conclude that the taint was not purged.

Third, there were intervening circumstances in this case between the constitutional violation and Mr. Martinez's <u>Mirandized</u> statement.  Agent Evans

62

is from a different law enforcement agency, the South Dakota Division of
Criminal Investigation.  Neither Agent Evans nor his agency participated in any
way in the violation of Mr. Martinez's Fourth Amendment rights.  In addition,
the interview with Agent Evans took place in a different location than where the
constitutional violation occurred.[11]

Finally, the court cannot conclude that Trooper Swets' violation of the
defendants' Fourth Amendment rights was purposeful and flagrant.  The
trooper was clearly acting with an investigatory design and, as discussed
above, could not have obtained the physical evidence except through
exploitation of the illegal detention.  However, as also discussed above, the case
law provides that a traffic stop is justified by any traffic violation, that an
officer's subjective motive in effecting a traffic stop is irrelevant, and that an
alert by a drug dog supplies probable cause for a search.  Given this case law,

---

[11]Somewhat analogously, the Supreme Court held that a defendant's
statement taken from him inside his home where police entered the home in
violation of the Fourth Amendment should be suppressed, but later statements
taken at the police station should not be suppressed.  New York v. Harris, 495
U.S. 14, 19-20 (1990).  As the Court explained, the Fourth Amendment seeks
to protect the home (among other things), so the purposes of the Fourth
Amendment are furthered by suppressing the statement taken in the
defendant's home.  Id. at 20.  However, suppressing a statement taken at the
station house after Miranda warnings are given does nothing to deter future
police misconduct aimed as violating the sanctity of the house.  Id.  Here,
Agent Evans did nothing wrong, either acting alone or in collusion with Trooper
Swets.  Therefore, applying the exclusionary rule to the statement he took from
Mr. Martinez would not further the purposes of the Fourth Amendment's rule
against unreasonable seizures.

the evidence shows that Trooper Swets intended to exercise to the fullest extent possible the authority given him by this case law, but the court cannot conclude that he intended to exceed his authority, even though he did. Although mistaken, Trooper Swets could have been making a good faith error in believing he had a reasonable basis for expanding the traffic stop. No evidence was introduced at the hearing that Trooper Swets conceded the unconstitutionality of his conduct, as the officers in the Brown case did.

Furthermore, there is no evidence to suggest that Agent Evans had any knowledge of facts that could have put him on notice that Mr. Martinez had been illegally detained. From the evidence presented, Agent Evans received a routine call to come to Rapid City to interview Mr. Martinez, knowing nothing about what had transpired between Captain Hodge and Trooper Swets. Agent Evans, in taking Mr. Martinez's statement, acted with no improper intent whatsoever. Based on the foregoing, the court concludes that Mr. Martinez's statement to Agent Evans should not be suppressed due to Trooper Swets' violation of the defendants' Fourth Amendment rights.

## CONCLUSION

The court recommends that Mr. Martinez and Mr. Hernandez-Mendoza's motions to suppress be granted in part and denied in part as follows:

1.  Mr. Martinez's statements in response to Trooper Swets' question as to why the carpet and trim in the Acura was torn up and the colloquy that followed should be suppressed;

2.  The physical evidence taken from the defendants' vehicle should be suppressed; and

3.  The statement by Mr. Martinez to Trooper Boumeister that the overnight bag contained both his and Mr. Hernandez-Mendoza's clothing for the trip to Iowa should be suppressed.

No other basis has been established for the suppression of any other evidence, including the conversation between the defendants in the back of Trooper Allen's patrol vehicle and Mr. Martinez's statement to Agent Evans at the highway patrol office.

## **NOTICE TO PARTIES**

The parties have ten (10) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the

district court.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v.

Black, 781 F.2d 665 (8th Cir. 1986).

     Dated June 30, 2008.

                BY THE COURT:

                /s/ *Veronica L. Duffy*

                VERONICA L. DUFFY
                UNITED STATES MAGISTRATE JUDGE